UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

PHYLLIS HUFF,

        Plaintiff,

  v.

NORTH LAS VEGAS POLICE DEPARTMENT; OFFICER GARCIA; JOSEPH FORTI; MICHAEL BLACKWELL; SHAYNE SKIPWORTH; JAKE HICKMAN; GARY NELLIS; GEORGE MIDDLEBROOK; and CITY OF NORTH LAS VEGAS,

        Defendants.

2:10-CV-01394-PMP-GWF

ORDER

Presently before the Court is Defendants' Motion for Summary Judgment (Doc. #67), filed on April 29, 2013. Plaintiff filed an Opposition (Doc. #82) on August 5, 2013. Defendants filed a Reply (Doc. #83) on August 22, 2013.

**I. BACKGROUND**

This is an excessive force and unreasonable detention case against several officers of the North Las Vegas Police Department ("NLVPD") arising out of Defendants' traffic stop of Plaintiff Phyllis Huff. Plaintiff brings claims under 42 U.S.C. § 1983 against Defendants Jake Hickman ("Hickman"), Shayne Skipworth ("Skipworth"), Gary Nellis ("Nellis"), Jose Garcia ("Garcia"), Michael Blackwell ("Blackwell"), and George Middlebrook ("Middlebrook"). (Am. Compl. (Doc. #30).) Plaintiff also asserts claims against Defendant City of North Las Vegas ("City") and its Chief of Police, Defendant Joseph Forti ("Forti"), for failure to train and supervise NLVPD police officers, and for ratifying excessive force by NLVPD officers. (Id.) Finally, Plaintiff brings state law claims for battery and intentional infliction of emotional distress. (Id.)

On August 22, 2008, Defendants Hickman, Skipworth, Nellis, Garcia, Blackwell, and Middlebrook were conducting a narcotics investigation related to the residence at 8704 Azure Sky, which was the home of suspected narcotics trafficker Devon Bradly. (Defs.' Mot. Summ. J. ["Defs.' MSJ"], Ex. A, Ex. B at 11, Ex. G at 16-17.) Prior to the incident with Plaintiff, Defendants stopped two other vehicles that left the residence. (Defs.' MSJ, Ex. A.) In one of the vehicles, police discovered over 3,000 ecstacy tablets in the possession of a narcotics trafficker whom the undercover officers had contacted earlier to request 3,000 ecstasy tablets. (Id.; Defs.' MSJ, Ex. B at 7-8.) The second vehicle failed to stop for police and drove erratically. (Defs.' MSJ, Ex. A.) The passenger in the vehicle was Devon Bradly, who was arrested for conspiracy to violate the Controlled Substances Act based on the earlier seizure of the ecstasy tablets. (Id.) The driver of the second vehicle was taken to the hospital after complaining of medical issues related to his diabetes, and Defendant Blackwell accompanied him to the hospital. (Id.)

At approximately 9:30 p.m., a green sedan, which had been parked at the residence when the officers began surveillance on the day in question, left the residence. (Defs.' MSJ, Ex. A, Ex. C at 11.) This vehicle was driven by Plaintiff. The parties differ over what happened next.

According to the officers, as the green vehicle approached where Defendant Hickman was parked alongside the curb, Hickman rolled down his window, waved to the driver, identified himself as a police officer, presented his badge, and asked to speak to the driver. (Defs.' MSJ, Ex. C at 12-13.) Hickman was not wearing a uniform and was in an unmarked Ford truck. (Id.) The driver of the green sedan drove away. (Id. at 14.) Hickman denies that he had any further involvement with stopping the green sedan. (Id. at 15.)

Defendant Garcia was stationed outside the housing development in which the Azure Sky residence was located. (Defs.' MSJ, Ex. D at 15.) Garcia was driving an

1  unmarked Nissan Pathfinder and he was not wearing a police uniform.  (Id. at 15-16, 30.)
2  According to Garcia, he exited his vehicle and raised up his hand to get the driver of the
3  green sedan to stop, but the driver did not stop.  (Id. at 14, 38.)  According to Garcia, he was
4  not further involved in stopping the green sedan and he arrived on the scene after the driver
5  already had been stopped and placed in handcuffs.  (Id. at 21, 23.)

6        Defendant Skipworth observed the driver "accelerate[] and drive[] erratically out
7  of the complex," and the driver did not stop until pulled over by Defendant Nellis, who had
8  activated the emergency lights on his car.  (Defs.' MSJ, Ex. A, Ex. B at 24, Ex. E at 17.)
9  According to Skipworth and Nellis, the driver, who turned out to be Plaintiff, exited the
10 vehicle and then got back into the car and closed the door.  (Defs.' MSJ, Ex. A, Ex. B at 9,
11 Ex. E at 21.)  Nellis and Skipworth ran up to the car.  (Defs.' MSJ, Ex. E at 21.)  The driver
12 side window was down, and Skipworth "reached in, [and] stopped [Plaintiff] from putting
13 the car in gear."  (Defs.' MSJ, Ex. B at 9.)  According to Nellis, Skipworth "controlled
14 [Plaintiff] by grabbing her wrist."  (Defs.' MSJ, Ex. E at 23.)  Nellis and Skipworth
15 "maneuver[ed] her out of the vehicle," Nellis put her in handcuffs, and escorted her to the
16 front of a police vehicle.  (Defs.' MSJ, Ex. A, Ex. B at 22-23, Ex. E at 27.)  Plaintiff did not
17 resist.  (Defs.' MSJ, Ex. E at 28.)  Defendants deny that Plaintiff was physically abused.
18 (Defs.' MSJ, Ex. B at 22, 31, Ex. E at 30, Ex. G at 38.)  Defendants deny they observed any
19 injuries on Plaintiff or that Plaintiff complained of any injuries.  (Defs.' MSJ, Ex. D at 31,
20 Ex. G at 38-39.)  At some point, Nellis put an extra set of handcuffs on Plaintiff to widen
21 the distance between her wrists to make it more comfortable.  (Defs.' MSJ, Ex. B at 32-33,
22 Ex. E at 28-29.)

23       The officers transported Plaintiff to the Azure Sky residence.  (Defs.' MSJ, Ex. B
24 at 9.)  Officers secured a warrant for the residence, and the search revealed marijuana,
25 ecstacy, cocaine, and drug-related paraphernalia.  (Id.)  Plaintiff was detained while the
26 officers searched the house and attempted to determine if she had any connection to the

3

1 narcotics in the house. (Defs.' MSJ, Ex. B at 33, 35.)  Following the search, Plaintiff was
2 released and no charges were filed against her because there was no probable cause to
3 connect her with the drugs in the home. (Defs.' MSJ, Ex. B at 9, 33.)

4       According to Plaintiff, she left the Azure Sky residence after doing her laundry
5 there. (Defs.' MSJ, Ex. I at 46.) As she left the residence, she saw a man waving at her
6 who asked to speak with her. (Id. at 39-40.) She denies that the man identified himself as a
7 police officer or that he displayed a badge. (Id.) She believed he was flirting with her, and
8 she advised him she was not interested, and drove away. (Id. at 53-54, 57-58.) She noticed
9 the man started following her in his truck, and she became afraid. (Id.) Not long after she
10 drove out of the housing area, she pulled over after a police car activated its lights. (Id. at
11 60.) She did not recall exiting her vehicle and getting back in as described by Skipworth
12 and Nellis, but she does not deny that could have happened. (Id. at 62-63.)

13       According to Plaintiff, four or five officers approached her vehicle, someone
14 punched her in the head twice, and she was forcefully removed from the vehicle by
15 someone grabbing her left arm. (Id. at 63-64, 70.) She was then "charged" toward an
16 officer's truck and slammed into the truck three times. (Id. at 63, 69, 71-74.) The officers
17 were yelling profanities at her, saying things such as "you think you were going to get away
18 from us, you fucking bitch . . . [t]his is what a fucking runner gets, you motherfucker." (Id.
19 at 67.) She was then searched by male officers under her shirt and pants. (Id. at 82-84.)
20 The officers then placed her in a patrol car for approximately two or three hours while they
21 searched her vehicle. (Id. at 77.) She was then taken to the Azure Sky residence for
22 approximately two more hours while the officers searched the house. (Id. at 78-79.) She
23 was not released until 2:30 a.m. (Id. at 79.) She denies her handcuffs were ever loosened
24 despite her multiple requests. (Id. at 63, 74, 80.)

25       Plaintiff states she suffered pain to her shoulders, back, upper lip, and left ankle,
26 as well as damage to a dental bridge from the incident. (Id. 87-89.) That night, she took

4

some Tylenol and went to bed because she had to get up for work in a few hours. (Id. at 91.) Plaintiff could not complete her shift at work, went home, took more medicine, and went to bed. (Id. at 91-92.) Her nephew told her she should see a doctor, but she stated she was too scared because the hospital might call the police. (Id. at 92.) Two days later, her nephew went with her to Mountain View Hospital. (Id. at 92-93.) At the hospital, Plaintiff complained of back and neck pain, and a headache. (Defs.' MSJ, Ex. J.) The hospital record does not reflect that Plaintiff complained about pain related to her ankle. (Id. at 8.) The treating physician diagnosed "contusion, neck pain, and back pain," as well as a mild headache. (Id. at 9, 12.) The contusions were on Plaintiff's left arm. (Id.) The treating physician did not note any "obvious external trauma" to Plaintiff's head. (Id. at 10.) The treating physician also did not observe any injury to Plaintiff's mouth, but the physician indicated a fracture of a dental bridge might be something she would not see upon examination unless the bridge was protruding. (Id. at 14, 17.) Plaintiff states she did not tell the emergency room doctor about pain in her mouth, instead going to her dentist. (Defs.' MSJ, Ex. I at 96.)

The hospital contacted the police and an officer from the Las Vegas Metropolitan Police Department arrived. (Defs.' MSJ, Ex. I at 93-94, Ex. L.) After determining the incident involved NLVPD officers, NLVPD lieutenant Randy Salyer ("Salyer") was contacted, and he interviewed Plaintiff at the hospital. (Defs.' MSJ, Ex. L.) Salyer asked Plaintiff to fill out a complaint form and requested that he be allowed to take pictures of Plaintiff. (Id.) Salyer took photos, but Plaintiff did not fill out a complaint form, and Salyer left the hospital. (Id.) Salyer observed marks on Plaintiff's arm and wrist, but saw no other injury. (Id.)

Following the complaint reported to Salyer, Skipworth and Nellis spoke to their supervisor, Defendant Middlebrook, about the incident. (Defs.' MSJ, Ex. B at 16, Ex. E at 10-11.) Hickman was not questioned by Middlebrook. (Defs.' MSJ, Ex. C at 18.) None of

5

1  the officers were questioned by an internal affairs officer regarding this incident.  (Defs.'
2  MSJ, Ex. B at 16, Ex. D at 34, Ex. E at 10-11.)  On September 24, 2008, Middlebrook sent
3  a memo to his supervisor, Defendant Blackwell, concluding that Plaintiff's allegations of
4  excessive force were unfounded.  (Defs.' MSJ, Ex. H.)

5        A month or two after the incident, Plaintiff obtained an MRI on her ankle which
6  showed cysts, but it was inconclusive as to whether the condition was pre-existing, or was
7  caused or exacerbated by the incident with the police.  (Defs.' MSJ, Ex. I at 96-97.)
8  According to Plaintiff, after the incident her dental plate was loose, and became more loose
9  over time, but she did not seek treatment from her dentist until 2010.  (Id. at 98.)  Plaintiff
10 states she still experiences pain in her neck, back, shoulder, and ankle.  (Id. at 99.)

11       Defendants now move for summary judgment on all of Plaintiff's claims.
12 Defendants argue they are entitled to qualified immunity on Plaintiff's excessive force and
13 unreasonable detention claims because the stop was supported by reasonable suspicion,
14 Defendants did not use an unreasonable amount of force under the circumstances, and
15 Defendants reasonably detained Plaintiff while her connection to the house and the drugs
16 was being investigated.  Defendants argue they are entitled to summary judgment on
17 Plaintiff's claim against the City because Plaintiff has no evidence of a policy or custom as
18 the moving force behind her alleged injuries, and Plaintiff has no evidence of a failure to
19 train amounting to deliberate indifference.  Defendants also argue they are entitled to
20 discretionary immunity on Plaintiff's state law claims, and that these claims nevertheless
21 fail on the merits.  Finally, Defendants argue Plaintiff has not established she is entitled to
22 punitive damages.

23       Plaintiff responds that genuine issues of fact remain regarding whether
24 Defendants used excessive force where Plaintiff stopped when pulled over by someone
25 identifiable as a police officer, did not resist, but nevertheless was punched in the face and
26 slammed onto the hood of a vehicle.  Plaintiff also argues her detention for five hours

without probable cause that she had committed a crime was unreasonable. Plaintiff contends Defendants are not entitled to qualified immunity because a reasonable officer under the circumstances would know the force was excessive and would know they cannot use force to retaliate against Plaintiff for allegedly being a "runner." Plaintiff contends a reasonable officer would know the detention was unreasonable based on a Nevada statute limiting detention based on reasonable suspicion to one hour.

As to municipal liability, Plaintiff argues NLVPD has a policy or custom of violating the constitutional rights of persons they believe are attempting to flee. Plaintiff also argues issues of fact remain as to whether NLVPD has a meaningful internal affairs process and whether NLVPD has a policy or custom of failing to discipline officers. Finally, Plaintiff argues NLVPD ratified the officers' conduct because there was no meaningful investigation and no officers were punished. Finally, as to the state law claims, Plaintiff argues Defendants' actions were not the kind of acts entitled to discretionary immunity under Nevada law.[1]

///

///

---

[1] In their Reply, Defendants argue "Plaintiff fails to provide any points and authorities in support of any claim against Defendants Joseph Forti, Michael Blackwell, Jake Hickman, Jose Garcia, or George Middlebrook." (Defs.' Reply in Support of Mot. for Summ. J. (Doc. #83) at 5.) However, Defendants' Motion for Summary Judgment did not make arguments specific to any individual Defendant's liability, instead referring to all individual Defendants collectively as "Defendants" or "Defendant Officers." (See, e.g., Defs.' MSJ at 15-16, 18, 24-25, 29.) Defendants did not argue in their initial Motion that these particular Defendants had no personal participation in the events in question and could not be liable on the basis of respondeat superior. The Court will not grant summary judgment based on arguments Defendants raise for the first time on reply. Nevertheless, the Court reminds Plaintiff of her obligations under Federal Rule of Civil Procedure 11 as it relates to Defendants Forti and Blackwell. None of the briefing or evidence mentions Forti as playing any role in the incident, either directly or indirectly. The evidence presented also indicates Defendant Blackwell was at the hospital with another individual pulled over that night and had no participation in stopping and detaining Plaintiff. Plaintiff therefore should consider whether she has a good faith basis to maintain her remaining claims against these Defendants.

7

## II. DISCUSSION

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002). Initially, the moving party bears the burden of proving there is no genuine issue of material fact. Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002). If the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial. Id. The Court views all evidence in the light most favorable to the non-moving party. Id.

### A. Counts One and Two - Violation of Constitutional Rights

To establish liability under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. Broam v. Bogan, 320 F.3d 1023, 1028 (9th Cir. 2003). To allay the "risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties," government officials performing discretionary functions may be entitled to qualified immunity for claims made under § 1983. Anderson v. Creighton, 483 U.S. 635, 638 (1987). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). In ruling on a qualified immunity defense, a court considers whether the facts viewed in the light most favorable to the party asserting the injury show the defendant's conduct violated a constitutional right. Sorrels v. McKee, 290 F.3d 965, 969 (9th Cir. 2002). If the plaintiff

makes this showing, the court then must determine whether that right was clearly established. Id.

A right is clearly established if "'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Wilkins v. City of Oakland, 350 F.3d 949, 954 (9th Cir. 2003) (emphasis omitted) (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)). The court should make this second inquiry "in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201. An officer will be entitled to qualified immunity even if he was mistaken in his belief that his conduct was lawful, so long as that belief was reasonable. Wilkins, 350 F.3d at 955. The plaintiff bears the burden of showing that the right at issue was clearly established. Sorrels, 290 F.3d at 969. But a plaintiff need not establish a court previously declared the defendant's behavior unconstitutional if it would be clear from prior precedent that the conduct was unlawful. Blueford v. Prunty, 108 F.3d 251, 254 (9th Cir. 1997). Additionally, a plaintiff may meet his burden on the clearly established prong by showing the defendant's conduct was "such a far cry from what any reasonable . . . official could have believed was legal that the defendants knew or should have known they were breaking the law." Sorrels, 290 F.3d at 971.

The parties do not dispute that Defendants acted under color of law. The only remaining questions related to counts one and two are whether Defendants violated Plaintiff's clearly established constitutional rights by using excessive force or unreasonably detaining Plaintiff.

### 1. Excessive Force

Courts analyze claims that law enforcement officers have used excessive force in the course of an arrest under the Fourth Amendment to the United States Constitution. Smith v. City of Hemet, 394 F.3d 689, 700 (9th Cir. 2005) (citing Graham v. Connor, 490 U.S. 386 (1989); Ward v. City of San Jose, 967 F.2d 280 (9th Cir. 1992) (as amended)). In

9

determining the reasonableness of a non-deadly force seizure, the Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." Miller v. Clark County, 340 F.3d 959, 964 (9th Cir. 2003) (quotations omitted). This entails a three-step analysis. Id. First, the Court must assess "the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted." Id. Second, the Court must assess "the importance of the government interests at stake by evaluating: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." Id. The Court may consider other factors, including "the availability of alternative methods of capturing or subduing a suspect." Smith, 394 F.3d at 701.

Third, the Court weighs the gravity of the intrusion against the government's interest to determine whether the amount of force was constitutionally reasonable. Miller, 340 F.3d at 964. The reasonableness inquiry looks at all the relevant objective facts and circumstances that confronted the arresting officers in each particular case, "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1058 (9th Cir. 2003) (quotation omitted); Smith, 394 F.3d at 701. Additionally, the reasonableness analysis must consider the fact that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Drummond, 343 F.3d at 1058 (quotation omitted).

Because the reasonableness balancing test "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," courts should grant summary judgment in excessive force cases "sparingly." Id. at 1056. "This is because police misconduct cases almost always turn on a jury's credibility determinations."

Id. However, a court may decide reasonableness as a matter of law if, "in resolving all factual disputes in favor of the plaintiff, the officer's force was objectively reasonable under the circumstances." Jackson v. City of Bremerton, 268 F.3d 646, 651 n.1 (9th Cir. 2001) (internal quotation omitted).

Here, genuine issues of fact remain regarding whether Defendants used excessive force against Plaintiff. Viewing the facts in the light most favorable to Plaintiff, Defendants punched Plaintiff twice in the face, pulled her from her car by the arm, and slammed her into a car three times. As to the governmental interests at stake, Defendants stopped Plaintiff because she had emerged from a house connected to narcotics activity, but Defendants had no probable cause to suspect Plaintiff had committed any crime. There is no evidence Plaintiff posed an immediate threat to the safety of the officers or others, and Defendants admit Plaintiff did not resist the officers. While Defendants assert they thought Plaintiff might be attempting to flee when she got back into her vehicle, she did not engage in actual flight from the officers. Balancing the amount of force used against the governmental interests, Defendants punched Plaintiff twice and slammed her into a truck three times even though Defendants lacked probable cause that she had committed any crime, had no evidence that she was armed, and she was not resisting the officers. A reasonable jury could find Defendants used excessive force under the circumstances.

Defendants acknowledge Plaintiff's version of events, to which she has testified under oath, differs from theirs, but Defendants suggest the Court should disregard Plaintiff's version as lacking in credibility. However, the Court does not make credibility determinations at the summary judgment stage. Dominguez-Curry v. Nev. Transp. Dep't, 424 F.3d 1027, 1036 (9th Cir. 2005). Further, Defendants are not entitled to qualified immunity because a reasonable officer would know punching Plaintiff twice and slamming her into a car three times when she was not resisting would be unreasonable. See, e.g., Davis v. City of Las Vegas, 478 F.3d 1048, 1054-55 (9th Cir. 2007); Lolli v. Cnty. of

Orange, 351 F.3d 410, 416 (9th Cir. 2003). The Court therefore will deny Defendants' Motion for Summary Judgment on Plaintiff's excessive force claim.

### 2. Unreasonable Detention

Police officers may make "limited intrusions on an individual's personal security based on less than probable cause." Michigan v. Summers, 452 U.S. 692, 698 (1981). An officer briefly may detain a suspect to maintain the status quo while investigating criminal activity. Id. (citing Adams v. Williams, 407 U.S. 143 (1972)). Such detentions may be made on less than probable cause, "so long as police have an articulable basis for suspecting criminal activity." Id. at 699.

To determine whether a seizure is permissible on less than probable cause, "it is necessary to examine both the character of the official intrusion and its justification." Id. at 701. The Court uses the objective reasonableness test of the Fourth Amendment to determine whether the seizure was unreasonable. Graham v. Connor, 490 U.S. 386, 395 (1989). Under this test, the Court balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." United States v. Enslin, 327 F.3d 788, 796 (9th Cir. 2003) (quotation omitted). Among the factors to consider are the severity of the crime at issue, whether the suspect posed an immediate threat to safety, and whether the suspect actively resisted arrest or fled. Graham, 490 U.S. at 396. The inquiry is fact specific, based on a totality of the circumstances. United States v. Turvin, 517 F.3d 1097, 1101 (9th Cir. 2008).

An investigative detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983). Additionally, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Id.; see also United States v. Sharpe, 470 U.S. 675, 686 (1985) ("In assessing whether a detention is too long in duration to be justified as an investigative stop, we

consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."). Consequently, to determine whether a seizure is unreasonable, the Court considers both "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1, 19-20 (1968). The government bears the burden of showing that "the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." Royer, 460 U.S. at 500.

Here, viewing the facts in the light most favorable to Plaintiff, genuine issues of fact remain as to whether Defendants unreasonably detained Plaintiff. Plaintiff does not assert the stop was unjustified at its inception, but Defendants have failed to show no issue of fact remains that the duration and manner of the detention were reasonable. Defendants stopped Plaintiff because she had emerged from the house where suspected narcotics activity had taken place. Two other vehicles previously had left the house, one containing 3,000 ecstasy tablets and the other refusing to stop. Defendants explained that they were concerned that one of the occupants of those vehicles may have called the residence and advised someone there to remove any contraband. (Defs.' MSJ, Ex. B at 24.)

However, a stop must last no longer than is necessary to effectuate the purpose of the stop. Defendants assert as justification for the stop that they suspected Plaintiff may be spiriting away contraband. Defendants held Plaintiff for two or three hours while they searched Plaintiff's vehicle. Defendants found no evidence of contraband and no evidence that Plaintiff was connected to narcotics trafficking or the Azure Sky residence other than that she had been inside the house. Defendants had no information from surveillance, a confidential informant, or any other source that Plaintiff was connected to the suspected narcotics activity at the residence. Once Defendants determined Plaintiff had not removed

contraband from the house as they suspected, and Defendants had no other information to support a reasonable suspicion that Plaintiff was engaged in criminal activity, Defendants nevertheless moved her from the location of the traffic stop to the Azure Sky residence and detained her there for approximately two more hours.  It is unclear from the record how long, if at all, Plaintiff was detained after Defendants determined that Plaintiff had no connection to the residence or the narcotics activity.  Defendants detained Plaintiff in handcuffs the entire time, even though she was unarmed, had not resisted the officers, and requested the handcuffs be adjusted for her comfort.[2]  A reasonable jury could find Defendants detained Plaintiff for an unreasonable amount of time and in an unreasonable manner.

Further, Defendants are not entitled to qualified immunity on this claim because a reasonable officer would know he could detain a person based on reasonable suspicion only so long as necessary to effectuate the purpose of the stop, and the use of handcuffs during the detention must be reasonable.  See, e.g., Royer, 460 U.S. at 500; Meredith v. Erath, 342 F.3d 1057, 1062-63 (9th Cir. 2003).  The Court therefore will deny Defendants' Motion for Summary Judgment on Plaintiff's unreasonable detention claim.

### B. Count Three - Violation of Constitutional Rights - Municipal Liability

A municipal entity may be liable under § 1983 "only where the municipality itself causes the constitutional violation through execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  Ulrich v. City & Cnty. of S.F., 308 F.3d 968, 984 (9th Cir. 2002) (quotation omitted).  Additionally, claims "against a governmental officer in his official capacity is equivalent to a suit against the governmental entity itself," and thus governmental officers "are liable in their official capacities only if policy or custom played

---

[2] Defendants contend they adjusted the handcuffs for Plaintiff's comfort, but the Court must accept Plaintiff's version as true.

14

a part in the violation of federal law." Gomez v. Vernon, 255 F.3d 1118, 1126-27 (9th Cir. 2001). A plaintiff may prove a municipal policy was the moving force behind a constitutional violation in three ways: (1) the municipality adopted an express policy; (2) a municipal employee commits a constitutional violation pursuant to the municipality's longstanding practice or custom; or (3) the person causing the violation has final policymaking authority. Webb v. Sloan, 330 F.3d 1158, 1164 (9th Cir. 2003).

Plaintiff does not argue and has presented no evidence that an express policy of Defendant City was the moving force behind the alleged constitutional violations. Plaintiff presents no evidence that NLVPD had a custom or practice of violating the rights of persons they suspected of fleeing or that NLVPD has a custom or practice of not investigating allegations against its officers. Plaintiff presents no evidence of any incident beyond the one in which she was involved. McDade v. West, 223 F.3d 1135, 1141 (9th Cir. 2000) ("A plaintiff cannot demonstrate the existence of a municipal policy or custom based solely on a single occurrence of unconstitutional action by a non-policymaking employee.").

As to action by a final policymaker, a municipality "can be liable for an isolated constitutional violation if the final policymaker 'ratified' a subordinate's actions." Christie v. Iopa, 176 F.3d 1231, 1238 (9th Cir. 1999). To establish ratification, the plaintiff must prove a final policymaker knew of the alleged violation and approved of his or her subordinate's act. Id. at 1239. Ratification generally is a fact question for the jury. Id. at 1238-39.

Plaintiff has failed to raise a genuine issue of fact that a final policymaker ratified the officers' conduct. Plaintiff has not identified who Plaintiff contends is a final policymaker. Further, Plaintiff has presented no evidence or argument to establish that individual is a final policymaker, and has presented no evidence or argument that individual knew of and approved of Defendants' actions. The Court therefore will grant Defendants'

Motion for Summary Judgment as to Plaintiff's municipal liability claims against Defendant City of North Las Vegas and Defendants in their official capacities.

**C. State Law Claims**

1. Discretionary Immunity

Nevada Revised Statute § 41.032 sets forth exceptions to Nevada's general waiver of sovereign immunity. Pursuant to § 41.032(2), no action may be brought against a state officer or employee or any state agency or political subdivision that is "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the State or any of its agencies or political subdivisions or of any officer, employee or immune contractor of any of these, whether or not the discretion involved is abused." To determine whether immunity for a discretionary act applies, Nevada utilizes a two-part test. First, an act is entitled to discretionary immunity if the decision involved an element of individual judgment or choice. Martinez v. Maruszczak, 168 P.3d 720, 729 (Nev. 2007). Second, the judgment must be "of the kind that the discretionary function exception was designed to shield," which includes actions "based on considerations of social, economic, or political policy." Id. at 728-29 (quotations omitted).

Defendants' decisions regarding the amount of force necessary under the circumstances necessarily are discretionary as the decisions involve elements of individual judgment and choice. Evaluating how much force is necessary at any given moment involves examining the totality of the circumstances and making moment-to-moment decisions which may change in a rapidly evolving situation. Defendants' decisions therefore were discretionary in nature.

However, the Court concludes Defendants' conduct does not fall under the second prong of the test because Defendants' decisions regarding the amount of force to use are not the kind of decisions the discretionary function exception was designed to shield. Evaluating whether police officers used excessive force in any given situation does not

16

involve judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy. The officers' obligations in this regard are grounded in the United States and Nevada Constitutions, not policy decisions from the legislative or executive branches. What level of force to use is not an integral part of governmental policy-making or planning. Imposing liability on officers who exceed the permissible use of force will not jeopardize the quality of the governmental process. Further, declining to apply the exception does not usurp the legislative or executive branch's power or responsibility. No branch of the government has the legitimate power to violate the Fourth Amendment of the United States Constitution. Defendants' conduct therefore does not fall within § 41.032 and Defendants are not entitled to discretionary immunity on Plaintiff's state law claim for battery. Because Plaintiff's state law intentional infliction of emotional distress claim is based on the alleged unreasonable use of force, Defendants likewise are not entitled to discretionary immunity on that claim.

### 2. Battery

Law enforcement officers "are privileged to use that amount of force which reasonably appears necessary, and are liable for battery to the extent they use more force than is reasonably necessary." Ramirez v. City of Reno, 925 F. Supp. 681, 691 (D. Nev. 1996) (applying Nevada law). Consequently, the standard for battery by a police officer under Nevada law is the same as under § 1983. Id. As discussed previously, genuine issues of fact remain regarding whether Defendants used reasonable force. The Court therefore will deny Defendants' Motion for Summary Judgment on Plaintiff's battery claim.

### 3. Intentional Infliction of Emotional Distress

To establish a cause of action for intentional infliction of emotional distress under Nevada law, a plaintiff must establish: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation."

Olivero v. Lowe, 995 P.2d 1023, 1025 (Nev. 2000). "[E]xtreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community." Maduike v. Agency Rent-A-Car, 953 P.2d 24, 26 (Nev. 1998) (quotation omitted). "Liability for emotional distress generally does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Burns v. Mayer, 175 F. Supp. 2d 1259, 1268 (D. Nev. 2001) (quotations omitted). To establish severe emotional distress, the plaintiff must demonstrate that "the stress [is] so severe and of such intensity that no reasonable person could be expected to endure it." Alam v. Reno Hilton Corp., 819 F. Supp. 905, 911 (D. Nev. 1993).

Plaintiff has failed to present evidence or argument that she suffered extreme emotional distress as a result of the incident. The Court therefore will grant Defendants' Motion for Summary Judgment on Plaintiff's intentional infliction of emotional distress claim.

### D. Punitive Damages

A plaintiff may obtain punitive damages under § 1983 if she proves the defendant acted maliciously, wantonly, or oppressively. Dang v. Cross, 422 F.3d 800, 807 (9th Cir. 2005). "Conduct is malicious if it is accompanied by ill will, or spite, or if it is for the purpose of injuring another." Id. (quotation omitted); see also Nev. Rev. Stat. § 42.001(3) (defining malice as "conduct which is intended to injure a person or despicable conduct which is engaged in the conscious disregard of the rights or safety of others").

Although Plaintiff did not respond to Defendants' Motion with respect to punitive damages, the Court will deny Defendants' Motion because Defendants failed to meet their initial burden of establishing no genuine issue of fact remains that Plaintiff is not entitled to punitive damages. See Henry v. Gill Indus., Inc., 983 F.2d 943, 950 (9th Cir. 1993). In support of their Motion, Defendants present Plaintiff's deposition in which she testified that Defendants punched her and slammed her into a car while yelling things such

as "This is what a fucking runner gets." A reasonable jury could conclude from this evidence that Defendants acted with the purpose of injuring Plaintiff as punishment for her perceived attempt to flee. The Court therefore will deny Defendants' Motion for Summary Judgment as to punitive damages.

**III. CONCLUSION**

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Doc. #67) is hereby GRANTED in part and DENIED in part. The Motion is granted as to Plaintiff's claims against Defendant City of North Las Vegas and against the individual Defendants in their official capacities. The Motion also is granted as to Plaintiff's intentional infliction of emotional distress claim with respect to all Defendants. The Motion is denied in all other respects.

IT IS FURTHER ORDERED that the parties shall file a proposed joint pretrial order on or before January 31, 2014.

IT IS FURTHER ORDERED that this matter is referred to Magistrate Judge Foley for a settlement conference.

DATED: December 23, 2013

_____
PHILIP M. PRO
United States District Judge